Justin M. Klein, Esq. (JK5349)
**MARKS & KLEIN LLP**
55 Wall Street
New York, New York 10005
Telephone: (732) 747-7100
Facsimile: (732) 219-0625
Email: justin@marksklein.com
Attorneys for Defendants Satellite Donuts, LLC,
Alexander McCourt, and Errington Walters

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KRISPY KREME DOUGHNUT CORPORATION AND NORTHEAST DOUGHNUTS, LLC,<br><br>     Plaintiffs,<br><br>vs.<br><br>SATELLITE DONUTS, LLC ALEXANDER MCCOURT, AND ERRINGTON WALTERS,<br><br>     Defendants. | CIVIL ACTION NO. : 10 - cv- 4272<br><br>**DECLARATION IN OPPOSITION TO PLAINTIFFS APPLICATION FOR A PRELIMINARY INJUNCTION** |

  Alexander McCourt, of full age, states under penalty of perjury, as follows:

  1. I am Alexander McCourt, a defendant in this matter.

  2. I make this Declaration in response to Plaintiffs' Motion for a Preliminary Injunction and in support of Defendants' Motion to Dissolve the Temporary Restraining Order.

  3. I am a principal in Satellite Donuts, LLC a Delaware limited liability company with its principal office at 80 Westwood Drive, Apt. 211, Westbury, NY 11590.

  4. On or about February 12, 2008, I together with my partner, Errington Walters ("Walters"), formed Satellite Donuts, LLC ("Satellite") for the purpose of owning and operating Krispy Kreme Doughnut shops.

5. I have been involved in the quick service restaurant industry as an employee of various quick service restaurant franchisors and franchisees for approximately 28 years. I have been an employee of quick service restaurant franchisees in the Krispy Kreme franchised system, and of Krispy Kreme, for approximately 7.5 years.

6. From June 1982 to March 1988, I was an employee at Burger King Corp., eventually becoming Shift Manager. As Shift Manager, my primary responsibilities included cash control, shift management, control food waste and labor management.

7. In 1988, I became an Assistant Manager at Roy Rogers. I became a General Manager in February 1989. As a General Manager, my primary responsibilities included overall operations of a million dollar QSR restaurant controlling food and labor cost, profit and loss reporting and accuracy, customer service, training new crew members. I was a General Manager at Roy Rogers until Wendy's International purchased the store where I was employed.

8. I worked for the Wendy's International franchised system from April 1994 to 2001.

9. In April 2001, following the onset of Multiple Sclerosis, I left Wendy's and moved to Wilmington, NC to attempt to get back on my feet. I was on disability for 11 months.

10. In December 2001, I accepted a position at First Sun Management, a franchisee of Wendy's Int'l., as a General Manager of a Wendy's Store. Thereafter, I joined the team at KKNY, LLC ("KKNY"), the North Carolina limited liability company running the New York Krispy Kreme market, under the auspices of Krispy Kreme.

11. I became an employee of KKNY in January 2003. I was the Director of Training for KKNY from August 2003 to April 2006 when KKNY closed its six stores, and sold the seventh and eighth stores – the Penn Station and Third Ave. locations – back to Krispy Kreme.

12. As Director of Training, my responsibilities included complete training for all newly hired managers for new store openings in the New York Market. My responsibilities included training new managers on retail, production, processing, cash control, labor management, shift operations and P&L responsibilities. Krispy Kreme gave me no additional training before promoting me and giving me these responsibilities.

13. Following KKNY's exit of the New York market and sale of its stores back to Krispy Kreme in 2006, I returned to work at Burger King Corp. as a "Company Business Manager." A Company Business Manager is a Multi-Unit Manager. I was at Burger King for three months before I was contacted by John Gibson and Glen Dorman at Krispy Kreme, and offered a position with Krispy Kreme in the New York Market.

14. At that time, Krispy Kreme offered me a position as Assistant General Manager of the Milford, CT Krispy Kreme commissary store. Krispy Kreme offered to match my base salary and give me a ten thousand dollar expense account. Mr. Gibson specifically told me Krispy Kreme wanted me to "come back and help it fix the many problems they were having at Milford" and that they would hire me as assistant general manger with the intention of promoting me to General Manager once they terminated the Milford GM. Mr. Gibson told me Krispy Kreme was "having a lot of problems" with their operations, and "could really use my help" as the Milford store and the New York Market were struggling financially.

15. I accepted the position and returned to work for Krispy Kreme.

16. In or around December 2007, I began discussing re-franchising the New York Market for Krispy Kreme with C.W. Bruton and Dan Lecocq, both of whom were Krispy Kreme employees.

17. On or about January 16th, 2008, I traveled to Winston-Salem, NC and met with

Bruton and Lecocq at the Krispy Kreme headquarters. At that meeting, I was asked how much I would be willing to pay for the New York Market, and my plans for turning the Milford location around. I informed Krispy Kreme them that I was willing to pay $1.00 (one dollar) for the New York Market, and that I believed Milford should be closed and a new commissary, closer to New York City, should be opened, to reduce delays in delivery time and improve product quality, and reduce rent and shipping expenses.

18. On or about the last week in January 2008, Walters and I spoke with Lecocq further discussed our desire to purchase the rights to own and operate the Krispy Kreme stores in Millford, CT and Penn Station, New York, NY.

19. As a result of this second meeting, employee Lecocq emailed a Letter of Intent ("LOI") on behalf of Krispy Kreme, dated February 4, 2008. A true and correct copy of the LOI is attached hereto as **Exhibit 1**. A true and correct copy of Lecocq's email is attached hereto as **Exhibit 2**.

20. The LOI offered Satellite the option to purchase the operational Krispy Kreme store at 1440 Boston Rd, Milford, CT ("Milford Location") and the operational Krispy Kreme store in Penn Station, New York, NY ("Penn Station Location"), for a purchase price of one dollar ($1.00), waived the initial franchise fee, and specifically "include[s] the menuboard and other assets purchased specifically for the proposed remodel of the Penn Station location". See **Exhibit 1**.

21. Thereafter, on or about February 21 and 22, 2008, Walters and I attended Krispy Kreme Discovery Day at 370 Knollwood Street, Winston-Salem, North Carolina, 27103.

22. On or about March 3, 2008, I received a Franchise Application and Credit Report Release Application from Lecocq, which I completed on or about March 7, 2008 and submitted

4

to Krispy Kreme.

23. Thereafter, I received a document titled "LOA", Leave of Absence, outlining the terms of my leave as Assistant General Manager of Milford and employee of Krispy Kreme to undertake rehabilitating and rebuilding the New York Market. A true and correct copy of the LOA is attached hereto as **Exhibit 3**.

24. I signed the LOA on or about April 25, 2008, taking the first step towards acquiring and turning around the New York Krispy Kreme Market.

25. Walters and I were willing to enter into a franchise agreement for the Penn Station Location and the Milford Location pursuant to the terms and conditions of the LOI; however, on or about May 16, 2008, Krispy Kreme approached us about operating the locations pursuant to an operating agreement instead of a franchise agreement.

26. On or about June 8, 2008, Satellite entered into an operating agreement with Krispy Kreme pursuant to which we agreed to operate the Penn Station location as a Krispy Kreme doughnuts shop. A true and correct copy of the Operating Agreement is attached hereto as **Exhibit 4.**

27. On or about April 15, 2008, in connection with the Operating Agreement Krispy Kreme requested that Satellite enter into an Asset Purchase Agreement dated April 18, 2008. A true and correct copy of the APA is attached hereto as **Exhibit 5**.

28. Pursuant to the Operating Agreement, the APA granted Satellite "all improvements, signage, furniture, fixtures, and equipment (the "Assets") existing on or within the Store". See **Exhibit 4** at 1. Included in the signage transferred to Satellite were Krispy Kreme signs, logoed menu boards, trade dress, which constituted the trade dress of Krispy Kreme stores.

29. On or about June 8, 2008, Satellite entered into a Franchise Agreement with Krispy Kreme pursuant to which we agreed to operate the Milford location as a Krispy Kreme donuts shop and commissary ("Milford FA").

30. On or about June 9, 2008, Satellite began operating the Penn Station location pursuant to the Operating Agreement and the Milford location pursuant to the Milford FA.

31. In connection with the operation of the locations, Satellite acquired several distribution agreements previously entered into by KKNY and/or Krispy Kreme. Included among those distribution agreements were agreements with Morrisons, D&R Central, MRS Baking, Bakery Solutions, distributors supplying, among other areas, central New Jersey. Upon termination of MRS Baking on March 3, 2010, I added a new distributor, Mr. Kevin Douglas, who to the best of my knowledge, supplies Asbury Park. I did not need Krispy Kreme's approval to add this distributor.

32. On or about September 18, 2008, at the request of Krispy Kreme, Satellite entered into a franchise agreement for the Penn Station location ("Penn Station FA"). A true and correct copy of the Penn Station FA is attached hereto as **Exhibit 6**.

33. Thereafter, on or about September 17 2008, Satellite, executed a Franchise Agreement for a second location in Penn Station, New York ("Penn Station FA No. 2") pursuant to which Satellite agreed to open and operate a second Krispy Kreme store on the Long Island Railroad level of Penn Station ("LIRR Location").

34. On or about June, 2009, Satellite entered into a franchise agreement for a "Fresh Shop" in Farmingdale, New York.

35. On or about March 20, 2009, with Kripy Kreme's knowledge and approval, Satellite entered into a lease agreement for a commissary location at 2162 Grand Avenue,

Baldwin, NY ("Baldwin Location").

35. On or about March 4, 2009, I received the Krispy Kreme income statement for the Penn Station Location and the Milford Location for the period from December 2005 through June 2008. A true and correct copy of the income statement is attached hereto as **Exhibit 7.** (NewEngland2.19.09 is title of document). The Income Statement indicated that the Penn Station Location and the Milford Location, together, had net income of *negative* one million six hundred fourteen thousand and one hundred eighty nine dollars (-$1,614,189), with the Penn Station Location achieving Net Income in the black and the Milford Location having net income in excess of *negative* $1.9 Million during the period. See **Exhibit 7**.

36. On or about September 18, 2009, Satellite entered into a franchise agreement with Krispy Kreme for a commissary store at the Baldwin Location ("Baldwin FA") to replace the commissary store run from the Milford Location with the new commissary store in Baldwin, NY. A true and correct copy of the Baldwin FA is attached hereto as **Exhibit 8**.

37. We requested Krispy Kreme's permission to purchase used equipment to build out the LIRR store, however, Krispy Kreme refused to grant us permission to install used equipment in the store, dramatically increasing the cost of build out and reducing our cash flow.

38. Specifically, Krispy Kreme had touted the use of used equipment to lower the cost of building a new store in its November 18, 2008 seminar titled, "Arizona Small Stores Share & Learn Summit" (a true and correct copy of which is attached hereto as **Exhibit 9)**, but refused to allow Satellite to do so, treating it differently that the other franchisees in the system.

39. On or about June 2009, after Satellite had approached multiple lenders for financing, including TD Bank, HSBC Bank, and GE Capital, Satellite approached Krispy Kreme for a one hundred fifty thousand dollar ($150,000) loan to complete construction of the Baldwin

Location.

40. On or about July 10, 2009, Krispy Kreme entered into a promissory note with Satellite pursuant to which Satellite agreed to pay Krispy Kreme one hundred fifty thousand dollars, and Satellite received eighty thousand three hundred sixty eight dollars and thirty two cents ($80,368.32) in cash from Krispy Kreme (the "Promissory Note"). The remainder of the value of the Promissory Note, sixty nine thousand six hundred thirty one dollars and sixty eight cents ($69,631.68), represented the outstanding invoices accrued and payable to Krispy Kreme at that time.

41. On or about December 2009 I again approached Krispy Kreme for a loan in connection with the expected closing of Milford, Farmingdale, and LIRR, asking KK to help us with the settlement agreements we had negotiated with the closing stores' landlords. Krispy Kreme informed me by email that it would only consider helping with the restructuring of the business (in connection with closing these stores) and the payments to the closed stores' landlords, if Satellite met the following "objectives": (1) close the Farmingdale store, which was already closed; (2) close the LIRR Location; (3) close the Milford Location; (4) submit to a complete financial audit; and (5) complete an operational audit. On or about January 13, 2010, an operational audit was conducted by Keith Laganowski and a financial audit was conducted by Charles Kristiene, both of whom are Krispy Kreme employees. Neither the operational audit nor the financial audit conducted less than six (6) months ago demonstrated any defaults or deficiencies in any regard whatsoever. The Milford Location was closed on or about January 4th, 2010, the LIRR Location was closed on or about December 20, 2010, and Farmingdale was closed on or about January 20, 2010. Despite Satellite completing all five "objectives," and hiring an attorney to facilitate the restructure at Krispy Kreme's request, Krsipy Kreme never

provided the requested funding.

42. Despite the fact that Satellite owed Krispy Kreme funds, at no point prior to May 12, 2010 did Kirspy Kreme issue Satellite a Notice of Default. Over the course of the two years which have elapsed since Satellite began operating the Penn Station Location, it has incurred in excess of $235,000 including the PromissoryNote (which has a current balance of approximately $116,000) in debt to Krispy Kreme, arising from the following categories: royalties, note payments, and approved products and brand fund. At no point prior to the May 12, 2010 Notice of Default did Krispy Kreme indicate that it would terminate the Franchise Agreements absent payment. Specifically, on or about December 24, 2009, Krispy Kreme employee C.W. Bruton promised to defer royalty payments for ingredients purchased, stating "we'll park it off to the side and we'll deal with it another day." Bruton further told me, "continue paying on your Note and paying for product on a C.O.D. basis, and we'll deal with the account on another day." Based on Bruton's comments, we acted accordingly in this regard.

43. On or about May 3, 2010, in an attempt to reduce Satellite's outstanding liabilities to Krispy Kreme, I began speaking with third party investors about investing in Satellite.

44. On or about May 3, 2010, I approached Laganowski and advised him that Kinderhook Partners was willing to invest sufficient capital in Satellite to pay all outstanding liabilities to Krispy Kreme and expand the New York market by building and developing additional Kripy Kreme Stores through Satellite.

45. Thereafter, on or about May 12, 2010, Krispy Kreme sent Satellite a Notice of Default ("Notice of Default"), a true and correct copy of which is attached hereto as **Exhibit 10**.

46. On May 12, 2010, Walters and I went to the Marriott Hotel to meet with Bruton at his request. Upon arrival, I was served with the Notice of Default and Mr. Bruton advised us

that Krispy Kreme was willing to forgive the debt if we turned over the stores to Krispy Kreme. We refused.

47. In response to Krispy Kreme's Notice of Default, on or about May 14, 2010, the day before my wedding, I made a telephone call to Bruton and informed him that an investor, Mr. Kosta Giannopoulos of Loop Food Management Corp. was willing to invest in Satellite and infuse enough cash into the business cure all of Satellite's alleged defaults. An hour later, at approximately 4:40 pm, Bruton called me back and informed me that it was "too late in the game" to begin the process of approving a third party to come in as an investor in the franchise to cure Satellite's alleged defaults. Bruton further told me that Krispy Kreme would not rescind the Notice of Default or extend the cure period.

48. I got married on May 15, 2010, and left for my honeymoon on May 18, 2010.

49. While I was on my honeymoon, I learned that on or about May 20, 2010, Krispy Kreme instructed its delivery truck not to deliver Krispy Kreme approved baking supplies and packaging ("Approved Product") to the Baldwin Location and Penn Station Location. However, to prevent the locations from closing, I instructed employees to purchase necessary ingredients, like flour, from a local bakery supply store in order to make donuts. Upon Krispy Kreme's resumption of product deliveries on May 29, 2010, at 12:30 a.m. following the hearing before this Court, all unapproved products were removed from the store.

50. Additionally, Krispy Kreme has hired one of Satellite's former employees to act as a "quality Inspector" and to oversee the operation of the stores, the stores compliance with the system and Satellite's adherence to the System Standards. At this time, Satellite has no objection to Ms. Perez' continued oversight of the stores and operations on Krispy Kreme's behalf pending the adjudication of this dispute.

51. Moreover, on June 6, 2010, the Baldwin store received a ninety five percent (95%) on its Quality Assurance Report. A true and correct copy of the Quality Assurance Report is attached hereto as **Exhibit 11**.

52. As of the date of this Declaration, the investor I secured is still willing to partner with Satellite and cure any alleged defaults.

53. As of the date of this declaration, Satellite has never received a Notice of Default under the Penn Station lease.

54. However, I have learned that Krispy Kreme has spoken with Mr. Bakshi of Saffron Developers, the Baldwin landlord, on several occasion during the 10 day cure period, and has spoken with Linda Frankle, the project Manager for the National Railroad Passenger Corporation, landlord for the Penn Station Store, during the cure period indicated in the Notice to Cure sent by Krispy Kreme; specifically, on May 19, 2010. I believe these discussions were for Krispy Kreme's benefit, not for the benefit of Satellite, the lessee on both leases.

55. As of the date of this declaration, Satellite has offered to cure the default under the Baldwin lease and stay eviction proceedings, including prepaying sixty thousand dollars of future rent to the Baldwin landlord. Satellite paid May Rent and Taxes, plus the late penalty assessed by the Baldwin Landlord, on or about June 8, 2010. Satellite will pay June rent for the Baldwin Location to the landlord on Friday, June 18, 2010.

56. I believe the Baldwin landlord has refused to allow Satellite to cure its default because Krispy Kreme has made a payment of approximately fifty thousand dollars ($50,000) to the Baldwin landlord for the landlord to allow it to come in and take over the site McCourt and I built with our bare hands.

57. As of the date of this Declaration, I have invested two years of my time and

energy into turning around the Krispy Kreme New York Market. As of the date of this declaration, I have invested approximately $23,000 (twenty three thousand dollars) into Satellite, and I have forgone the fifteen hundred dollars per week of Member draw I am entitled to, leaving that capital for Satellite's use. As a result of our work, Satellite profitably operates the stores.

58. At no point has Satellite received a Notice of Termination of the Baldwin Franchise Agreement or the Penn Station Franchise Agreement.

59. I have never been to Asbury Park, New Jersey. I do not own any property or any leases in Asbury Park, New Jersey. I do not have an ownership interest in the alleged "unauthorized 'rogue' location in New Jersey". I have never sold a single donut directly to a location in Asbury Park, New Jersey.

60. Satellite does sell product to distributors pursuant to distribution agreements which have been in place since Satellite purchased the New York Market from Kripsy Kreme.

61. To the best of my knowledge, while I was an employee of Krispy Kreme or KKNY, Krispy Kreme and KKNY never requested that I sign a non-compete agreement.

62. All knowledge that I have about the Krispy Kreme System, I acquired while I worked as an employee of Krispy Kreme and KKNY, before I signed a franchise agreement with Krispy Kreme.

63. I attended the hearing before the Hon. Ira Warshawsky today at the Nassau County Supreme Court. At the hearing Judge Ira Warshawsky held oral argument on the eviction proceeding for the Baldwin Lease, Index No. 9571/2010. Judge Warshawsky stayed the eviction proceeding and held that so long as Satellite fully cures the defaults under the Lease by July 9, 2010, the lease will be reinstated and the proceeding closed.

64. On or about May 7, 2010, I received a Note Statement by email from Krispy

Kreme employee Lanette Holmes, a true and correct copy of which is attached hereto as **Exhibit 12**. The Note statement indicated as follows: payments on 4/2, 4/9, 4/16, 4/23, and 4/30 were made. Krispy Kreme auto debits my business account every Friday to make payments on the Note. To the best of my knowledge, I am only in arrears $5,649.55. To the best of my knowledge, there are no other outstanding payments on the Note. It is unclear to me why Krispy Kreme has not auto debited the amount they claim to be in arrears.

Dated: June 10, 2010

By: <em>s/ Alexander McCourt</em><br>Alexander McCourt